```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY
 2
    ORTHO BIOTECH PRODUCT, L.P., : Docket No. 2:05-cv-04850(SRC)
 3                               :
              Plaintiffs,        :
 4                               :
          vs.                    :
 5                               :
    AMGEN, INC.,                 : Newark, New Jersey
 6                               : Friday, February 1, 2008
              Defendants.        : 10:45 a.m.
 7  ---------------------------
 
 8              TRANSCRIPT OF DISCOVERY MOTIONS
         BEFORE THE HONORABLE MICHAEL SHIPP, U.S.M.J.
 9
    APPEARANCES:
10  For the Plaintiffs:    ERIK HAAS, ESQ.
                           (Patterson, Belknap, Webb & Tyler)
11                         1133 Avenue of the Americas
                           New York, NY   10036-6710
12
                           WALTER F. TIMPONE, ESQ.
13                         (McElroy, Deutsch, Mulvaney & Carpenter
                           LLP)
14                         1300 Mount Kemble Avenue
                           Morristown, N.J. 07962-2075
15
    For the Defendants:    MICHAEL R. GRIFFINGER, ESQ.
16                         MICHAEL F. QUINN, ESQ.
                           CHRISTOPHER T. WALSH, ESQ.
17                         (Gibbons, P.C.)
                           One Gateway Center
18                         Newark, NJ   07102-5310

19                         DOUGLAS E. WHITNEY, ESQ.
                           (McDermott, Will & Emery)
20                         227 West Monroe Street
                           Chicago, Ill 60606-5096
21

22  Transcription Company: KLJ Transcription Service
                           246 Wilson Street
23                         Saddle Brook, NJ   07663
                           (201) 703-1670
24
    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.
```

1

I N D E X
02/01/08

2                                                    Page

OVERVIEW                                              3

3

MOTION TO PRECLUDE DISCOVERY

4    By Mr. Haas                                    6, 36
     By Mr. Whitney                                 23

5

MOTION REGARDING DISASTER RECOVERY TAPES

6    By Mr. Haas                                    38
     By Mr. Griffinger                              43

7

MOTION TO EXTEND DISCOVERY

8    By Mr. Haas                                    41, 58
     By Mr. Griffinger                              48, 61

9

COURT DECISION                                 62 - Reserved

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                          3

1          (Proceedings begin at 10:45 a.m.)

2          THE COURT:  Okay.  This the matter of <u>Ortho Biotech</u>

3  <u>Products v. Amgen</u>, Docket No. 05-4850.

4          Counsel, may I have your appearances for the record,

5  please?

6          MR. HAAS:  Your Honor, Erik Haas with Patterson,

7  Belknap, Webb & Tyler on behalf of Plaintiff Ortho Biotech.

8          THE COURT:  Good morning.

9          MR. HAAS:  Good morning.

10         MR. TIMPONE:  Walter Timpone, Your Honor, McElroy,

11  Deutsch, Mulvaney & Carpenter.

12         THE COURT:  Good to see you, Mr. Timpone.

13         MR. GRIFFINGER:  Good morning, Your Honor, Michael

14  Griffinger from Gibbons for Amgen.

15         THE COURT:  Good morning.

16         MR. WHITNEY:  Good morning, Your Honor, Doug Whitney,

17  McDermott, Will & Emery on behalf of Amgen.

18         THE COURT:  Good morning.

19         MR. QUINN:  Good morning, Mike Quinn from Gibbons and

20  also with us is Mary Beth Cantrell from Amgen.

21         THE COURT:  Okay.  Good morning.

22         MR. WALSH:  And Chris Walsh from Gibbons also, Your

23  Honor.

24         THE COURT:  Good to see you as well.

25         All right.  By way of background, counsel raised a

1   number of outstanding discovery disputes in correspondence to

2   the Court in November and December 2007.  This Court conducted

3   an in person status conference on December 12, 2007.  At that

4   time I instructed counsel to meet and confer and attempt to

5   resolve any outstanding discovery-related disputes between

6   themselves.

7          I also advised counsel to provide the Court with a

8   letter regarding any issue that could not be resolved and that

9   the Court would hear oral argument on those issues.

10          Counsel raised three outstanding discovery-related

11  issues in their joint submission to the Court dated January

12  22nd, 2008.  The issues are:

13          One, the dispute regarding the propriety of Amgen's

14  privilege assertions at the deposition of Ed Hansen in

15  connection with the document inadvertently produced by Amgen

16  during discovery.

17          Two, the dispute regarding which party should bear

18  Amgen's costs associated with the review and production of

19  documents from Amgen's discovery disaster recovery tapes.

20          Three, the dispute regarding a potential extension of

21  discovery time.

22          The January 22nd, 2008 joint letter referenced an

23  additional issue raised by Ortho; namely, the propriety of

24  certain redactions in Amgen's document production.  Ortho

25  viewed the issue as properly framed and Amgen believed that the

1   issue was inconsistent with the Court's instructions to the

2   parties during the December 12 conference to refrain from

3   making any additional substantive submissions.

4          The Court was willing to address all the discovery-

5   related disputes this morning.  Toward the beginning of this

6   week I asked whether Amgen's counsel could respond to the issue

7   in advance of today's oral argument.  On January 29th, 2008,

8   counsel advised the Court that it needed approximately seven

9   days to adequately address the issue.  I understand Amgen's

10  position and decided to proceed as follows:

11         First, Amgen should submit its response regarding the

12  propriety of certain redactions by Friday, February 8th, 2008.

13         Second, Ortho may submit a reply by Friday, February

14  15th, 2008.

15         Even though we have an outstanding issue, I did not

16  want to postpone this morning's oral argument on the issues

17  that are ready for argument.  The Court will tentatively

18  schedule oral argument on the redaction issue for Friday,

19  February 29th, 2008 at 3 p.m., at which time the Court will

20  render its decision on all of the discovery-related issues.

21         If the Court does not feel the need to hold oral

22  argument on the 29th, it will notify counsel of the same and

23  will put its decision on the record on the 29th.

24         The Court will now hear oral argument on the three

25  discovery-related issues.  First, the dispute regarding the

1   propriety of Amgen's privilege assertions at the deposition of

2   Ed Hansen, and in connection with the document inadvertently

3   produced by Amgen during discovery.

4           Let's hear first from counsel for Ortho.  Mr. Haas?

5           MR. HAAS:   Thank you, Your Honor.

6           Your Honor, Amgen has made as you noted two privilege

7   assertions to preclude Ortho discovery of financial analysis

8   Amgen conducted in connection with its 2007 strategic analysis.

9   The first is the privilege assertion over the document

10  submitted in-camera, and that document itemized financial

11  analyses that Amgen was to conduct in 2007.  It was a list of

12  financial analyses done in the regular course of business.

13  There's a list of analyses done, and it identified the

14  individuals, the employees at Amgen who were responsible for

15  completing those financial analyses.

16          Second, Amgen cut off 30(b)(6) testimony at

17  deposition on issues of Amgen's financial analyses which

18  Amgen's own e-mails that were admitted at deposition clearly

19  demonstrate was done as part of its 2007 contract strategy.

20  It's our position that those privilege assertions were patently

21  inappropriate.  The law is clear.  When analysis is done for

22  business purposes, Amgen may not shield that analysis merely by

23  disclosing it to counsel.

24          So under that clear and undisputed rule as the facts

25  here play -- as they play out, demonstrate that that

1    information is discoverable.  And I think there's three key

2    things to note here:

3            First, the plain language of the documents.  And I

4    point Your Honor in particular to the document that was

5    submitted in-camera.

6            And if, Your Honor, may I approach?

7            THE COURT:  Sure.

8            MR. HAAS:  I pulled these out to make it simpler for

9    us to do.

10           MR. GRIFFINGER:  Thank you.

11           MR. HAAS:  Of the exhibits that we submitted, Your

12   Honor, I pulled out the three that demonstrate our points most

13   succinctly.  The first is a document that was submitted in-

14   camera.  Now as I noted, this is a list of financially (sic)

15   analysis Amgen is to conduct.  And if you just walk down the

16   list, it is evident from the description that these are the

17   types of analyses that are done in the regular course of

18   business.

19           For the first one, for example, how can we get

20   appropriate reimbursement rate to go down with Aranesp to

21   improve our family CR?

22           CR, Your Honor, is a reference to margin.  And on the

23   first page of the first document it's the document with a Bates

24   stamped AMGM-01557993.  Your Honor --

25           THE COURT:  I'm with you.

1          MR. HAAS:  Okay.  So I'm just referencing the

2   individual items --

3          THE COURT:  Sure.

4          MR. HAAS:  -- each one of these is numbered.  I'm

5   starting with the first one.  I'm just going to pull a few out,

6   so we can talk about it.  But it says, how do we get

7   appropriate reimbursement that's our drug, Ortho's drugs

8   reimbursement down with Aranesp to improve family CR -- to

9   improve family margin?

10         Your Honor, that's what this case is about.  It's

11  about the comparison of margin of Procrit, to the comparison of

12  margin on their portfolio of drugs.  What Amgen is debating

13  here is an internal business move of how they are --

14         THE COURT:  CR is cost recovery?

15         MR. HAAS:  Cost recovery, Your Honor.  That's Amgen's

16  term for margin to oncologists.  How much margin can doctors

17  make on their portfolio, and that's it.  It's a comparison of

18  their portfolio versus our drug.  And what we argue in this

19  case is that comparison which they -- we contend is an anti-

20  competitive arrangement, where they've got portfolio versus an

21  individual drug, well, it's our view that's anti-competitive.

22  They're saying, how can they improve that situation?  So to as

23  to improve their competitive position.

24         So that's point one.

25         And each of these as we walk down are examples of the

1    same thing.

2              Number five, analysis of retail market and benefits.

3    What are ASP analytics with current retail forecast?  How do we

4    ship to retail business?  Your Honor, that's an analysis of how

5    to shift share, that's a business analysis.  That's an analysis

6    that's important for this case because what they want to do is,

7    they want to build up their retail share because by doing so,

8    that subsidized their price, that subsidized their

9    reimbursement, that improves their margin.

10             I know this is getting a little bit into the weeds,

11   but that is an issue that has been raised in this case as to

12   whether and to what extent Amgen can raise its retail share to

13   improve their position without engaging in their anti-

14   competitive bundle.  Okay?

15             So it's a business concern.

16             And each one of these is like this.  You turn to the

17   second page, all these initials of the participants, these are

18   individual business people.  There's not a single lawyer there.

19   These are individual business people.  They look at the

20   support, so they've got who's responsible for this project, who

21   has the support role, who is supposed to be doing the work with

22   the responsible person, and what is the due date for the

23   analysis.  All business people, no lawyers, work that has to be

24   done for the business.

25             Turn to the next page, the third page and we go on.

1   What is the value of -- I'm looking at Item No. 10 now.  What

2   is the value of selling some Aranesp in dialysis?  Can we use

3   it to temporarily boost ASP?

4            Again, the issue in this case, is there an

5   alternative to the bundle?  One alternative Amgen had, rather

6   than engaging in this competitive conduct, was to convert a

7   market from its drug Epogen to its drug Aranesp.

8            Now what that would have done is, it would have

9   improved their ASP, their reimbursement rate for Aranesp,

10  making them more competitive for Aranesp against Procrit.  That

11  would allow them to engage in head to head competition.  They

12  wouldn't have needed to bundle.

13           So what that is, is an analysis of whether and to

14  what extent they need to bundle at all.  That again is a

15  business analysis.  And I can march through each one of these,

16  Your Honor.  Each one if you look at them, the plain language

17  demonstrates.

18           Yeah, look at Number 19, for example.

19           THE COURT:  Let's look at Number 11.  "Can we create

20  a contract based on growth of market instead of share -- and I

21  have a very small version here -- sales that's more litigation

22  friendly?"

23           And I understand that there are some of these that

24  kind of hedge.  But I'm more interested in the ones that may

25  cut directly and have a closer bearing upon litigation.

1          MR. HAAS:  That -- that's an interesting --

2          THE COURT:  Aside from just the use of the word

3    "litigation."

4          MR. HAAS:  Right.  And that's exactly the situation.

5    And you know what, it goes exactly to what they did.

6          What they did is, they modeled APC2006.  This is a

7    contract -- this is a document that is in the 2006.  It's

8    contemplating the contract that is to go into place in 2007.

9    And what they're saying is, we have this -- you know, they

10   recognize they have a coercive bundle out there.  They have

11   this bundle that we are challenging.

12         THE COURT:  Uh-huh.

13         MR. HAAS:  And they are saying, all right, what can

14   we do cosmetically to make it more litigation friendly?  And

15   whether and to what extent is that going to affect our share?

16   Is it going to make a difference?

17         So you know what they did, in 2007, they adjusted the

18   minimum rebate they can earn, that oncology clinics could earn

19   under the bundle.  So even if you don't meet the hurdles of

20   that contract, even if you -- which we say is what really

21   drives the coercion, there is still enough rebates under the

22   new APC2007 for oncologists to break even.  They're not going

23   to lose money on Medicare.

24         So they did make a change to their contract in

25   APC2007.  And this is the analysis that led to a change that

1    they actually -- that actually happened.  And that -- it's an

2    interesting point because it frames the issue that I think if

3    we step back from why we are looking for these documents, it

4    really demonstrates it.

5        What Amgen is saying, you can -- you can obtain

6    discovery of what our terms are, but you're not entitled to

7    understand the how or the why.  Why and what extent was the

8    financial analysis done to come up with those terms?  But the

9    how and the why are the essence of monopolistic intent.  That

10   is a key element of the Sherman Act Section 2 claims.

11       We are entitled to discovery as to the analysis into

12   why Amgen adopted the terms that it did.  You can't shield that

13   analysis merely by showing it to counsel.  And if the

14   determination was to change your contract because you want to

15   make it more litigation friendly, that can -- that goes

16   directly to the monopolistic intent.  We're entitled to

17   discovery of that.

18       So even though just one item brings up this

19   litigation point, you know, taking out -- that's still in my

20   mind, in our view, in our position, demonstrates exactly the

21   point we want to make.

22       Let me just point out one more because I think it

23   really jumps out to Your Honor.  Number 19, conduct market

24   research on what is important to our customers currently.  I

25   mean, what is important to our customers currently?  That's

1    what the business concern is all about.  Has nothing to do with

2    an attorney/client privileged communications.

3          And, Your Honor, under the precedent of this Court,

4    we've cited in our briefs, <u>Johns Mansville</u>, a Vioxx case

5    exactly on point.  Merely having counsel in the room

6    particularly in the pharmaceutical arena, is not grounds for

7    obtaining protective privilege assertions.  It just simply is

8    not.  So that's the first document.

9          Second is -- are the two documents that were admitted

10   at deposition of Mr. Hansen.  Now Mr. Hansen was a 30(b)(6)

11   witness for Amgen.  So he's not testifying individual fact

12   capacity, but rather as a representative.  And it was our --

13   the deposition we noticed that on October -- or me noticed in

14   September, but it was held on October 30th of last year.  It

15   was the first deposition in the merit phase.

16         Why did we go first?  Because we wanted to understand

17   what they did in 2007 because we've had no discovery on that.

18   So we needed to understand what was the strategy and what was

19   implemented.

20         So what we did is, I asked Mr. Hansen what was the

21   analysis that was done leading up to the contracts at issue.

22   On Page 147 of the transcript, you'll see that counsel

23   instructed his witness not to answer questions -- and do you

24   have the transcript, Your Honor?

25         THE COURT:  Yes, I do.

1          MR. HAAS:  Here it is.  It's Page 147.

2          THE COURT:  Okay.

3          MR. HAAS:  "You know, in connection of the analysis

4    of APC2007 and the terms thereof, did Amgen run cost recoveries

5    for its drugs in Procrit utilizing ASPs that were calculated

6    under the proposed allocation rule?

7          "I can't divulge that information."

8          Asserting attorney/client privilege, right there.  He

9    did it time and time again, and then they took a lunch break to

10   talk about it even further.  Gave them the full opportunity to

11   consult with his counsel on the issue, Your Honor.  And then we

12   came back from lunch, and on Page 155, he took the position

13   that I'm not -- I can't divulge that information because the

14   only analysis done on that issue, and that issue is a

15   reimbursement issue, it's referred in the parties' papers as

16   the bundle allocation rule or the CMS rule, or the MedPAC

17   issue.  He took the position at that time, I can't testify

18   about it because it had nothing to do with our contractual

19   strategy.  It was something that was done, you know, with

20   counsel.  Had nothing to do with our strategy.

21         In fact, that's not true.  You know that because they

22   submitted materials to CMS on this very issue.  But just

23   sticking with the issue that's important for this case,

24   contractual strategy, I said, are you sure; are you sure that's

25   your position; you're sticking with it.  And that's on Page

1   155.

2              And then I said, all right, well, let's go to the

3   documents.  And those are the next two documents that I gave

4   Your Honor.

5              THE COURT:  Okay.

6              MR. HAAS:  It's the Exhibit 5 to our November 26,

7   2000 letter, and it's Exhibit No. 8 to the November 26, 2000

8   letter.  There's two e-mails, both from --

9              THE COURT:  One second.

10             MR. HAAS:  Okay.  You'll --

11             It's in the package I handed up to Your Honor to use

12   as reference.

13             THE COURT:  Okay.  Let me look in there.

14             MR. HAAS:  It's just -- it's right after the one we

15   were just looking at?

16             THE COURT:  Go ahead.

17             MR. HAAS:  There's two more e-mails.

18             THE COURT:  Yes.

19             MR. HAAS:  But then they have the -- the exhibit tabs

20   from the deposition.  Hansen Exhibit No. 9, and then it's

21   Hansen Exhibit No. 8.

22             THE COURT:  I'm with you.

23             MR. HAAS:  Now what are these e-mails?  These are e-

24   mails both from December -- from 2006, late in 2006.  They're

25   from Beverly Simmons, who was the head of Amgen's contractual

1   strategy group.  It's to a series of people, including Fred

2   Manick (phonetic) who is the key person that was involved in

3   this strategic analysis.

4           And if you look at the language of the first one,

5   Hansen Exhibit No. 9, and I'll just read for you.  It said,

6   "The decision was made to extend the current contract for one

7   quarter, so that we would be able to incorporate any relevant

8   learnings from the alternative contract strategy team that Mike

9   Ryan and Fred Manick are leading."

10          So they're deferring their strategy in order to

11  incorporate, incorporate this analysis.

12          Their -- "the team is close to bringing the analysis

13  of recommendations to closure.  There is one more loose end

14  which will be the MedPAC recommendation relative to the CMS

15  issue of how rebates should be applied to the products in the

16  portfolio contract."

17          That is exactly what the witness was instructed not

18  to answer on Page 147.  That's the issue.  "It is expected that

19  this report will come out the second week of January, that

20  recommendation could impact our contract strategy."

21          So you have an analysis by this alternative contract

22  strategy team that is impacting contract strategy.  That is

23  what we need discovery of.  That's what this case is about.

24  The case is, what goes into your contracts?  They were talking

25  about the APC2007.  It's right up there on the top.  The

1   APC2007 is the contract that's at issue in this litigation.  We

2   allege it's coercive and anti-competitive.

3            So this is an analysis that we need to know, not just

4   what the terms are, but the how and the why.  That's what this

5   analysis goes to.  Instructing not to answer, showed him the

6   documents, said, well, doesn't this change your, you know, your

7   view?  It says right here, done for contractual analysis that

8   came an answer, privileged.

9            Nothing we did had to do with the contractual

10  strategy.  It was all separate privileged.  No so.  It's right

11  here in black and white, Your Honor.

12           Let's look at the next one.  This is Hansen Exhibit

13  No. 8.  Again, the top e-mail is from Beverly Simmons, head of

14  the contracting group to Fred Manick, the leader in this

15  strategic thinking.  And the e-mail writes, below that says,

16  "as you can see from the message from Stewart and Cynthia, a

17  meeting has been scheduled for Jim."  Jim Daly (phonetic), is a

18  senior executive at Amgen, "for next Tuesday to review clinic

19  contract options for '07."  Again, subject matter is what are

20  we doing with our contract.

21           "At this time we should be looking at a couple

22  different scenarios that could drive different contracting

23  strategies.  Point one, CMS position fee schedule, burdens

24  Aranesp with Neulasta and Neupogen."

25           Your Honor, that's the exact same issue.  Once again,

1    they're considering the impact of that on their contracting

2    strategy.  Simply want discovery of that issue.  This was a

3    30(b)(6) witness.

4           I was seeking to determine how did that analysis

5    impact your contract?  Simple issue, simple line of

6    questioning, was foreclosed from looking at that analysis.

7    It's our position that was entirely inappropriate.

8           So that's Fact No. 1.  What was the plain reading of

9    what the document said?

10          Fact No. 2.  Amgen has engaged in this same type of

11   analysis that's reflected in the in-camera document and in the

12   e-mails for 2004, 2005, 2006.  And they produced that.  When it

13   came to 2007, they said, hmm, let's shield it.  Let's show it

14   to attorney, and so now we don't have to produce that?  Now we

15   don't have to tell Ortho what our analysis was because we're

16   going to bring an attorney into the room?  That's not

17   appropriate.

18          Your Honor, last night I went out and I just pulled a

19   document -- and if I may approach again, I'll show you just to

20   give you a flavor of what I'm talking about here.  And there's

21   many, many documents on this, Your Honor.  I just pulled this

22   out last night so we would have an example to look at.  But if

23   you turn to Page 8, it's a page flagged for your reference.

24          This is a document that Amgen produced.  It's part of

25   their strategic analyses that were done for its contract in

1    2004.  And we've got documents from 2005 and 2006 and I can

2    produce those as well.  But if you turn to Page 8, it's develop

3    -- I'm looking at the bullet -- second bullet point for

4    example.

5              "Develop strategy in detail to plan to grow.  To grow

6    Aranesp share in MCO retail business."  Again, contemplating

7    developing a strategy to grow retail business.

8              "Influence MCO transition to ASP reimbursement and

9    position Aranesp favorably."  Again, same issues.  They're

10   talking about how for contract purposes can we improve

11   Aranesp's position.

12             If we look at the last bullet point.

13             "EPO, develop optimal strategy, timing, triggers in

14   plan for potential ESRD conversion to Aranesp in 2004 and

15   2006."

16             That's the exact same issue as Number 10 on the in-

17   camera document.  That's the exact same thing.  They're looking

18   to say, you know, I described to you earlier, Your Honor,

19   should we convert the ESRD segment to Aranesp, and will it

20   benefit and implications for oncology, exact same issue.

21             "Develop optional strategy and planning for managing

22   downside risk of proposed reimbursement changes in 2005."

23             The same issue as Number 2 on the in-camera list.

24             There's a -- I can submit a panoply of documents

25   demonstrating the exact same type of financial analyses done

1    every year in the regular course of business at Amgen for its

2    contractual strategy.

3              That's for 2007, we don't get to inquire about that?

4    You see, this is vitally important, Your Honor, and the reason

5    why we can't otherwise determine this is because the discovery

6    cutoff was December 31st, 2006.  I don't have the documents.  I

7    don't have these to be able to go to another source.  I have to

8    rely on their 30(b)(6) witness and I was cut off.  I don't have

9    the discovery I need in order to fully make out my argument.

10   So that's Fact No. 2.

11             Fact No. 3, Amgen fully understands this is

12   information that is used in the regular course of business and

13   is fully discoverable.  How can we show that?  Simply.  Let's

14   look at their very own discovery demands.

15             Your Honor, I've given you two documents here, both

16   of discovery demand made by Amgen.  First is a subpoena to a

17   third party.  The third party they subpoenaed was an entity

18   known as CRA that conducted analysis on Ortho's behalf.

19             So if you look at Request No. 18 of this first

20   demand, and I'll give you the page number.  It's Page 8.  It's

21   the very last page before the --

22             THE COURT:  Uh-huh.

23             MR. HAAS:  -- yellow slip.  Demand to CRA, Ortho's

24   agent in some respects in this regard.

25             "All documents concerning any efforts by you, Ortho,

1   or any other person to determine the affect on Procrit sales or

2   red blood cell grow factor sales, generally of any of the

3   following market events:  One, the issuance of in January 2007

4   of the Medicare Payment Advisory Commission's report entitled

5   'impacted change in Medicare payment on parts to be dry.'"

6           That's the MedPAC, the Medicare Payment Advisory

7   Commission, that's MedPAC.

8           THE COURT:  Uh-huh.  Uh-huh.

9           MR. HAAS:  So we saw that reference earlier, same

10  thing.  They're demanding from us the same analysis that we

11  sought discovery of them.  They said, no, you can't get it

12  because it's attorney/client privilege.  It's not.  It's

13  regular course of business financial analysis used for the

14  business.  It can't be shielded simply because you bring an

15  attorney into the room.

16          Second and third issues are the same, Your Honor.

17  CMS proposed adoption of an allocation of price concession of

18  drugs under a bundled arrangement.  Same language as in the

19  earlier documents we looked at, Your Honor, for the purposes of

20  calculating ASP.  So that's their request to our agent.

21          More recently, Your Honor, Amgen just commenced

22  depositions with this fairly extensive 30(b)(6) notice, and if

23  you would look among the 20 topics -- I don't know if you could

24  call it the most narrow request -- but if you would look at

25  Topic No. 11, again, it's almost a mirror image request.  Now

1    they're seeking testimony of our witnesses, our 30(b)(6)

2    witnesses.

3           Really ironic, Your Honor.  When I asked the question

4    of their witnesses, I get cut off.  They're asking the same

5    thing from my 30(b)(6) witness?  From Ortho's 30(b)(6) witness?

6    It's the exact same wording.  "All efforts by Ortho to

7    determine and forecast the effect or potential effect on

8    Procrit sales or red blood cell grow factor sales generally of

9    any of the following events:

10          "One, the issuance in January 2007 of the Medicare

11   Payment Advisory Commission report, the MedPAC report.

12          "Two, CMS's proposed adoption of an allocation of

13   price concession on drugs sold under bundled agreement."

14          Your Honor, the exact same query.  They fully

15   understand work that done in the regular course of business for

16   developing contracts and contract strategy.  It's a very

17   central issue in this case.  And we would submit that it should

18   be deemed discoverable and Amgen should be ordered to produce

19   the information.

20          THE COURT:  Okay.

21          MR. HAAS:  Thank you, Your Honor.

22          THE COURT:  Thank you, Mr. Haas.

23          Mr. Griffinger.

24          MR. GRIFFINGER:  Mr. Whitney will present this

25   argument, Your Honor.

1           THE COURT:  Thank you.

2           MR. WHITNEY:  Good morning, Your Honor.

3           THE COURT:  Good morning.

4           MR. WHITNEY:  Your Honor, there's three simple

5    reasons why Ortho's motion to compel should be denied.  First,

6    Amgen's privilege assertions were very limited in scope.  Two,

7    they have been fully supported by sworn testimony of two senior

8    executive contracting personnel at Amgen.  And, three, they are

9    entirely consistent with the governing law of this circuit.

10          In Mr. Haas's presentation, he's attempting to ignore

11   entirely the sworn testimony and the evidence we have presented

12   in support of our privilege assertion.  He did not once mention

13   the very detailed affidavit or declaration of Fred Manick which

14   sets forth in very careful detail the creation of the document

15   that Mr. Haas is challenging.

16          And the reasons why it was created; namely, for the

17   purpose of seeking legal advice from Amgen's inside and outside

18   lawyers regarding potential regulatory changes, potential

19   competitive responses, and the impact of those potential

20   changes on a number of legal issues, including the instant

21   litigation.

22          The testimony of Mr. Hansen and the testimony of Mr.

23   Manick are clear, they're unequivocal, they're consistent, and

24   they're uncontradicted that the analysis Mr. Haas is seeking,

25   contrary to his repeated assertions, did not, Your Honor,

1   impact in any way the terms of APC2007, the contract that is

2   now at issue in the litigation and the contract about which Mr.

3   Hansen was the 30(b)(6) deponent.

4           In terms of the first issue, Your Honor, the scope, I

5   think it's important to put a little context around this

6   deposition of Mr. Hansen and the contracting scenario

7   generally.  Mr. Hansen was designated as the 30(b)(6)

8   representative of Amgen for the structure and development and

9   implementation of APC2007, Amgen's latest contract.  That

10  contract was developed and approved by the pricing committee in

11  May of 2007, and it was implemented in the marketplace in July

12  of 2007.

13          The events at issue here about which Mr. Haas is

14  submitting documents, relate to various contingencies occurring

15  during the course of 2006.  There were two primary

16  contingencies that Amgen was facing in 2006.  One was, what

17  would happen if Ortho prevailed in this litigation?  What

18  impact would that have on Amgen's contracting strategy?  And as

19  you might imagine, Your Honor, Amgen sought legal advice

20  regarding that issue.  That occurred during the summer of 2006.

21  As you may know, this case went before Judge Chesler for a

22  preliminary injunction hearing in June of 2006, and the ruling

23  came down in the fall of 2006.

24          The second contingency, Your Honor, is the

25  announcement in October of 2007 by CMS which is the government

1   agency responsible for setting reimbursement for the drugs at

2   issue in this case.

3          In October of 2007, CMS addressed an issue that Ortho

4   had been extensively lobbying on.  And that is whether or not

5   discounts in a bundled contracting arrangement should affect

6   the rates of reimbursement for all of the products within the

7   bundled contracting arrangement.

8          So the second contingency Amgen's faced in the fall

9   of 2007 was, what if Ortho and its lobbyists prevailed on that

10  front and CMS actually adopted a policy shifting the discounts

11  in that regard?  Recalculating or reallocating the

12  reimbursement rate from one product to the other?

13         CMS did not act in October of 2007, and in fact did

14  not act any time prior to the launch of APC2007 in July of

15  2007.  No action was taken on this issue.

16         So what you have, Your Honor, is Amgen at that time

17  addressing a contingency of Ortho and their lobbyists

18  prevailing on CMS down the road and winning and obtaining a

19  rule or a regulation or a program change that would have

20  required the reallocation of discounts.

21         They sought legal advice on that issue as you might

22  expect.  How such a regulatory environment might affect

23  potential competitor responses of Ortho and of Amgen.  How

24  those competitive responses might be viewed in the new

25  regulatory environment.  Legal issues relating to those

1   competitive responses including, of course, the impact on the

2   instant litigation, which as you noted is referenced on a

3   number of occasions in the document itself.

4              THE COURT:  Mr. Whitney, let me just ask you a few

5   questions here.

6              The advice or the questions being posed, are those

7   legal questions or business questions?  Are you saying that the

8   Amgen personnel here were seeking information and advice with

9   regard to what would happen legally, or are we saying what

10  approach should we approach as a business strategy?  Because

11  they're two very different questions in my mind.

12             MR. WHITNEY:  You're absolutely right in framing the

13  question that way, and the answer is clear.  They were asking

14  legal questions.  They were asking the legal team at Amgen,

15  what -- what would the legal implications be of certain

16  competitive responses?  They weren't asking the legal team to

17  come up with competitive responses.  This is an extremely

18  dynamic, it's an extremely complicated competitive environment

19  made complicated by the reimbursement scheme, by the nature of

20  the purchases, and the competition.

21             It is, I can say personally, extremely difficult to

22  understand as an outsider, as a lawyer all the nuances that go

23  into the competitive decision-making.  It is imperative as Mr.

24  Manick sets forth in his declaration that lawyers have that

25  nuance understanding of what exactly is going on in the

1    marketplace, what could change in the marketplace, how the two

2    competitors could respond to one another, in order to be able

3    to give informed intelligent and useful legal advice.

4              And it is clear, and Mr. Manick's declaration that

5    Mr. Haas ignored entirely throughout his lengthy presentation.

6    It's Exhibit 4, and I can hand up another copy for Your Honor.

7              THE COURT:  I've reviewed it at length.

8              MR. WHITNEY:  It makes perfectly clear, Your Honor,

9    that the purpose of all of the analyses set forth in the

10   document that Mr. Haas referenced, was in fact performed for

11   the purpose of educating the lawyers about potential

12   competitive responses and a listing from the lawyers, legal

13   advice about the potential implications of engaging in any of

14   those scenarios set forth on this document.  The legal

15   implications of that, how that could affect, among other

16   things, the instant litigation.

17             You noted litigation's referenced in Line 11.  It's

18   also referenced in Item 4.  But the bottom line here is, the

19   lawyers couldn't understand the dynamics of the marketplace

20   without being presented this information.  And what Mr. Manick

21   says and what in fact happened despite Ortho's refusal to

22   acknowledge it, is that Amgen said when this rule came out and

23   they -- and what the team said was, we're looking at the issue.

24   There's a potential down the road that we may act on this

25   issue.

1        So what Amgen said, we need to figure out if they do

2   act, what would it look like, what could we do, what might

3   Ortho do, and is any of that going to impact the legality of

4   our contracting arrangement?  And the impact to this -- the

5   course of this litigation.

6        So they put together a team of business people and

7   legal people to provide a forum where information could be

8   shared confidentially from business people to legal people, to

9   elicit, to, one, inform the legal personnel about how this

10   would have worked; and, two, elicit from the lawyers their best

11   informed judgment about whether or not any potential

12   competitive responses would impact the legality, any legal

13   issues relating to Amgen's contracting scheme, or could impact

14   this litigation.

15        And Mr. Haas ignores the fact that Mr. Manick in his

16   declaration of Paragraphs 17 and 28, and Mr. Hansen in his

17   testimony repeatedly stated in no uncertain terms that this

18   analysis, this hypothetical potential analysis done solely for

19   the purpose of getting the lawyers up to speed in getting legal

20   advice in return was not used in developing the terms of APC07.

21        And if -- Mr. Haas referenced Mr. Hansen's deposition

22   transcript.  If you look at Page 155, his testimony could not

23   be more clear on this point.  Although he repeats it several

24   times in response to several questions from Mr. Haas, but he

25   says, the analysis of the proposed CMS bundle allocation was

1    not done for the purposes of the APC07 contract.  And it did

2    not affect the terms of the APC07 contract.

3             And, Your Honor, there's a simple reason for that.

4    There was no reallocation change that occurred prior to the

5    development, the approval, and the launch of APC2007 all of

6    which occurred by July of 2007 by which time CMS had not in

7    fact acted to reallocate any discounts for the purposes of

8    calculating reimbursements of the various drugs.

9             So what Mr. Haas is trying to do here is, take the

10   issue completely out of context.  He's also trying to take the

11   deposition entirely out of context.

12            Mr. Hansen was designated solely to testify about the

13   development of APC2007.  He sat for seven hours.  There's over

14   300 pages of his transcript.  He did not refuse to answer a

15   single question about APC2007.  He testified about its

16   structure.  He testified about its development.  He testified

17   about its implementation.  We've produced the initial pricing

18   committee dec from November of '06 regarding APC2007.  We've

19   produced the final pricing committee dec from May of 2007 which

20   included all the business analytics related to the development

21   of APC2007.

22            Mr. Haas did not ask a single question regarding

23   APC2007, as opposed to these two other contingencies that

24   counsel either instructed Mr. Hansen not to answer, or that in

25   fact Mr. Hansen did not fully answer as Amgen's representative.

1            In essence, Mr. Haas is trying to compel testimony

2    that doesn't exist.  He's trying to ignore the uncontroverted

3    testimony of two Amgen individuals, the one who implemented

4    APC2007, and the one responsible for the entire contract and

5    pricing department that both stated in no uncertain terms, that

6    the contingency analysis that Mr. Haas is talking about did not

7    in fact impact and was not used to develop the terms of

8    APC2007.

9            THE COURT:  Mr. Whitney, can you address for me Mr.

10   Haas's point with regard to Mr. Hansen being precluded from

11   answering a question that was specifically speaking to the

12   contract strategy?  And I believe it was in response to a

13   question from -- or an e-mail from Mr. Hansen's boss that was

14   dated December 7.  It was in the transcript, and Mr. Haas

15   raised it in his opening argument, and I was particularly

16   concerned or wanted to know more about the instruction there,

17   and the answer why he couldn't answer that?

18           MR. WHITNEY:  I believe, Your Honor, just so the

19   record is clear, that you're referring to what was marked at

20   Mr. Hansen's deposition as Exhibit 9.  Is that correct?

21           THE COURT:  No.  I believe it was Exhibit 5.  Let me

22   just find it first and I'll lead you to the precise area.

23           MR. HAAS:  To help you out, that, Your Honor, it's

24   Exhibit 5 to the November 26th letter and it is Exhibit No. 9

25   to the Hansen exhibit.

1          THE COURT:  Okay.

2          MR. HAAS:  So you're both right.

3          THE COURT:  Thank you.

4          MR. WHITNEY:  Thank you, Mr. Haas.

5          MR. HAAS:  For the record did help, Judge.

6          MR. WHITNEY:  In connection with this e-mail, what

7    this e-mail states from Beverly Simmons is that the work being

8    done on the alternate contract strategy team could -- could

9    impact the development of APC2007 because at that time no one

10   knew whether in fact CMS was going to act and reallocate the

11   discounts prior to the launch of APC2007.

12          And it says, it refers to potential relevant

13   learnings from this contingency analysis centered around the

14   potential future action of CMS.

15          Well, obviously if CMS acted, then that relevant --

16   that analysis might later become relevant to the development of

17   the contract.  In fact, we know CMS did not act prior to the

18   launch of APC07, so there was no relevant learnings, in the

19   terms of Miss Simmons, to be used in the development of Amgen's

20   contract.  And that's exactly what happened and that's what Mr.

21   Hansen testified to.

22          His testimony is clear on several points in the

23   transcript, Your Honor, that key -- none of the analyses

24   regarding the CMS bundled reallocation that may be referred to

25   here by Miss Simmons was used at all for the purposes of

1    developing APC2007.  So any analysis done in that group as set

2    forth clearly in Mr. Manick's declaration was done solely to

3    receive legal advice regarding potential and future competitive

4    responses if and when CMS were to act in the future regarding

5    the reallocation of the discounts.

6              Does that answer your question, Your Honor?

7              THE COURT:  I think I'm well on my way to getting

8    there, sir.  Thank you.

9              MR. WHITNEY:  In terms of -- a couple of points I

10   just want to highlight regarding Mr. Manick's declaration.  And

11   just to make it clear that we have satisfied the elements of

12   privilege under the law of this circuit.  And for that I think

13   in the papers submitted to the Court is set forth in Ford Motor

14   Company case, (3rd Cir. 1997), which I'm sure you're familiar

15   with.  And, again, Ford Motor states very clearly, that it's

16   not the form of any analysis that governs the relevant inquiry.

17   In that case, the District Court refused a privilege claim

18   because it found the documents at issue related to business

19   matters or purely factual matters.

20             The Third Circuit reversed that refusal to honor a

21   privilege claim in that circuit and rightly found that the

22   inquiry is not what the document looks like or what's contained

23   in the document, but why the document was created and why the

24   analysis referred to in the documents wasn't -- was

25   contemplated at all.

1          And there's only one reading of the record we have in

2    this case before Your Honor with Mr. Hansen's testimony and Mr.

3    Manick's declaration and that is, all of the analytics

4    referenced in the document, even though they clearly relate to

5    business matters, Mr. Haas was right about that.  But the

6    analytics were done in that case for the purpose of seeking

7    legal advice.  And whether you apply Ford Motor, or you apply

8    the test in Vioxx, you apply the test in any case, the fact

9    that legal advice and the desire to get legal advice motivated

10   the creation not only of that document, but the running of

11   those analytics make them privileged.

12         THE COURT:  If analytic -- let's just move away from

13   the facts here, for just a quick second.

14         If a company puts together a business plan every

15   single year and on a given year, they decide to run their

16   business plan by their legal department to inquire from the

17   legal department whether or not this is a sound business plan,

18   if there are any potential liabilities here, just to elicit

19   some legal advice, does that then make that document

20   privileged?

21         MR. WHITNEY:  In the scenario you just described,

22   Your Honor, it doesn't sound like it to me because they would

23   have created that business plan even if they weren't concerned

24   about getting legal advice.  That's very different here because

25   this contingency came about and Amgen said, we need to get

1    legal advice on the potential ramifications of the contingency,

2    and then engaged in this analysis.

3              It's very different.  Mr. Haas is trying to draw a

4    comparison back to earlier contracting analysis.

5              THE COURT:  Uh-huh.

6              MR. WHITNEY:  It's an entirely different animal here

7    because we have a contingency that did in fact occur prior to

8    the launch of the contract.

9              In earlier documents he referenced, the regime change

10   in reimbursement, A, was certain; B, there weren't nearly the

11   legal issues at play in that respect.  That was pre-litigation

12   obviously.  It was pre-ruling in this case.

13             So this was a unique situation because there was a

14   unique contingency and a unique desire to get analysis from the

15   legal department on that contingency.

16             THE COURT:  Okay.

17             MR. HAAS:  Your Honor, may I make two quick points?

18             THE COURT:  Let me --

19             MR. HAAS:  I'm sorry.  I thought you were done.

20             MR. WHITNEY:  In terms -- and, again, I just want to

21   make the record clear as to what Amgen has produced in

22   conjunction with APC2007.  Amgen has produced all the business

23   analytics that were called for pursuant to the cutoff deadline

24   in this case.  It has produced a 30(b)(6) deponent.  It has

25   provided full testimony on that.  It provided initial

1   contracting ideas for APC2007 in August 2007, in November --

2   August 2006, rather.  November of 2006, provided the final

3   pricing committee dec in May of '07.  Provided the final

4   contracts.  It provided -- it has not withheld any documents

5   relating to the development and the structure of APC2007.  And

6   I think that it's important that the record be clear on that,

7   despite arguments of counsel.

8           So I think basic -- on the record before Your Honor,

9   there, again, is only one conclusion, that the document and the

10  -- that Mr. Manick created, was created for the purposes of

11  seeking legal advice.  Under the law of this circuit, that

12  document is protected.

13          Similarly, Mr. Hansen's limited -- the limited

14  instructions at Mr. Hansen's deposition to refrain from

15  divulging attorney/client privilege, and that was all that was

16  done.  And they're very few in the course of the seven-hour

17  deposition were properly made because the two contingency areas

18  about which he said, the analytics were protected.  Each of

19  those scenarios, one, was run for the purpose of seeking legal

20  advice regarding the impact on this litigation; and, two, did

21  not affect the final terms of the contract which Amgen has

22  fully produced.

23          Mr. Haas cannot now sit here and complain about the

24  discovery cutoff he, himself, proposed and agreed to.  That is

25  not the fault of Amgen, and it certainly insufficient to

1   undermine are legitimate, are well supported and are judicious

2   privilege claims.

3           THE COURT:  Okay.

4           MR. WHITNEY:  Thank you very much, Your Honor.

5           THE COURT:  Thank you.

6           Mr. Haas, I'm -- you're invited to make a few

7   comments, but we do have other arguments to get to, so I'm

8   going to --

9           MR. HAAS:  Two short points.

10          THE COURT:  -- urge you to move along.

11          MR. HAAS:  I'll be -- I'll be very brief, Your Honor.

12          THE COURT:  Sure.

13          MR. HAAS:  You asked whether there were legal

14  questions presented by the document, Mr. Whitney focused on the

15  CMS issue.  But just to make sure we're absolutely clear, if

16  you look at 7, "What is the impact of casing top accounts, if

17  you assume competition with -- countered with added discounts?"

18  That has nothing to do with a legal issue.  It's a business

19  analysis we looked at before.  The "what is the impact on our

20  customers?"  That's a business issue.

21          The test, Your Honor, is a but for test.  Wouldn't

22  the analytics be done but for the legal advice?  The answer is,

23  yes.  These are all business and analytics.  Even the CMS

24  proposal letter.

25          And how do you know that?  Two things, first of all,

1    they did submit a proposal to the CMS.  They did lobby against

2    this change.  They had to do the analytics anyway.  That's

3    number one.

4             Number two, they're asking for the same thing from

5    us.  It's the type of analysis that they fully understand is

6    discoverable.

7             The second thing Mr. Whitney said that was import

8    that this had no impact on contract strategy, going back to the

9    e-mail that we looked at, it says right on the face, this --

10   the e-mail that he just referred to which is Exhibit 5 and the

11   Exhibit 9 to the Hansen deposition.  The decision was made to

12   extend the current contract for one quarter.  To incorporate

13   the relevant learnings from the alternative contact strategy

14   teams.

15            It had an impact on contract strategy.  That's why

16   they want to know how it impacted ours.  We had documents

17   through December 26, 2006.  Nobody's disputing the cutoff date.

18   We're merely seeking to get the discovery we need through

19   30(b)(6) testimony in order to properly litigate this case.

20            Thank you, Your Honor.

21            THE COURT:  Okay.  Let's move to the final two

22   arguments.  I want to hear them together from both sides.  And

23   those arguments relate to the dispute regarding which party

24   should bear Amgen's costs associated with the review and

25   production of documents from Amgen's disaster recovery tapes,

1   as well as the dispute regarding the potential extension of

2   discovery time.

3            MR. HAAS:  Okay.  Thank you, Your Honor.

4            With respect to our motion to compel the backup tape

5   discovery, Your Honor, Amgen is making an unprecedented

6   position.  Amgen is taking the unprecedented position that

7   Ortho should bear the cost of its attorneys' review of

8   documents that have already been converted from inaccessible to

9   accessible format.  There has been no Federal Court decisions

10  that we have found, and we have looked that has shifted the

11  cost from the respondent to the requester as a condition of

12  receiving information from backup tapes.

13           Quite to the contrary, the cases that have looked at

14  that issue have said in some circumstances it may make sense to

15  shift the cost of converting inaccessible data to accessible

16  format in some circumstances.

17           In the Zuba Lake (phonetic), of course Your Honor

18  knows is the seminal decision there, and the Court goes through

19  a number of factors and they weigh things such as, you know,

20  what is the wherewithal of the individual to actually pay for

21  them?  And so in some circumstances, they say it's a big

22  corporation, from any backup tape from a little company that

23  you're going to have to pay the cost of converting.  But in

24  those same cases, the Courts are clear, under no circumstances.

25  That's the wording in the cases.  Under no circumstances are

1   attorneys' review costs to be shifted.  Under Federal

2   jurisprudence, the rule is, each party bears the cost of its

3   own attorney/client attorney review of its own documents.

4           Now consistent with the Federal rules, the parties

5   agree, they also have an agreement here.  So we have the

6   Federal rules and we have an agreement that the only costs that

7   are going to be shifted are the recovery costs, and that's

8   Exhibit B to our letter.

9           Exhibit C to our letter demonstrates that Amgen fully

10  understood that that did not include attorney review costs.

11  Attorney -- Exhibit B was an itemization by Mr. Walsh of what

12  the cost Ortho had to bear in order to get these documents.

13  Now this is the beginning of the process.

14          So we said, what -- what is this going to cost us?

15  And we started with a large number of tapes.  We brought it

16  down to one.  We brought it down to one that was created before

17  this litigation started because we wanted documents that were

18  kept in the regular course of business before the inception of

19  the litigation.  So we brought that all down and we said, how

20  much is this going to cost?  And there was an itemization of

21  all of the costs involved, that itemization did not include

22  attorney review cost.  Consistent with the Federal rules,

23  consistent with our stipulation which is in Exhibit B, that

24  itemization has had nothing, nothing about attorney review

25  costs being shifted from Amgen to Ortho.

1           But twice thereafter, and that's Exhibit D and E to

2    our papers, that agreement was amended because Amgen said,

3    well, we want you to pay for something else; we want you to pay

4    for something; well, we made a mistake, we left something out

5    in the first one.  And so you might see it in the papers, they

6    asked for kid glove service, for example, the cost of shipping

7    the tapes from one office to another, even though every single

8    paper of the other 50 million pages of documents in this case

9    has been sent by fed-ex in a CD, they said, no, no, no.  In

10   order to get your backup tapes, we have to have a security

11   officer with white gloves they call it.  It's the white gloves

12   office service and they'll ship it by a security car from one

13   site to another.  Fed-ex wouldn't suffice.

14          But it was of the amount which would have cost more

15   for us to litigate it and to avoid bringing unnecessary issues

16   to Your Honor, we said, okay, we'll pay for that.  But this is

17   too far.  They have now asked for us to pay for the attorney

18   costs, their own attorneys' review of documents as a condition

19   of producing documents we're entitled to, highly relevant, it

20   was agreed from day one that the parties would retain this

21   document in order for it to be produced, we stipulated exactly

22   what it was that we were to produce and the Federal Rules of

23   Evidence are clear -- that Federal procedures are clear, there

24   should be no shifting of attorney review costs in order to get

25   that which you're entitled to.

1           So we respectfully submit that Amgen should bear its

2    own costs.  These documents that are already converted should

3    be treated like every single one of the 15 million pages that

4    have been produced.  Amgen should bear its own costs and should

5    produce the documents, so we can move forward with the

6    litigation.

7           Thank you, Your Honor.

8           THE COURT:  Okay.  Please address also at this time,

9    Mr. Haas, the proposed extension of discovery at the time, or

10   discovery time.

11          MR. HAAS:  Your Honor, the last time we were in

12   chambers, I went through the whole history of the case.  I'll

13   run through that again for you.

14          THE COURT:  Thank you.

15          MR. HAAS:  But my point there was, enough is enough.

16   I think that's where I left off.  Is that we've been litigating

17   this case for three years, we've gotten endless, endless

18   discovery, but just to squarely put a little coin on it, we

19   were just dealing with this issue in October.  We were before

20   Magistrate Falk, Amgen said, we need a six-month adjournment of

21   the trial schedule.  Six months adjournment premised on the

22   fact, well, there's been a delay in the discovery production.

23   We need additional time for the documents that are to be

24   produced up to the end of October.  The custodian files, we

25   need to have more time to review those, and Magistrate Falk

1   said, you guys go back, solve your redaction issues and don't

2   bring them to the Court, solve them and produce them.  And

3   Amgen said, well, we need to be able to review those too.

4   Right?  That was in October.

5           So they moved the schedule six months and adopted the

6   schedule Amgen proposed on that premise.  Nothing has changed

7   since then that militates an adjournment of this schedule.  We

8   have -- Ortho has complied fully with the agreement.  As of

9   October 31st, we discussed this last time, we've produced 30 --

10  the files of 30 out of 31 custodians, over 11 million pages.

11  There was one custodian that they discussed.  His family had a

12  death in the family, he moved, his computer crashed, perfect

13  storm, but that was one.  It was produced by the end of the

14  time, by the way.

15          But 30 and 31 custodians.  All of that was requested

16  by the end of October.  Then we unredacted documents and we

17  listened to Magistrate Falk and we had indeed, we got the

18  letter from opposing counsel, said, well, you're producing

19  documents that say redaction all over it.  Said, well, the

20  Magistrate Falk said, go back.  You better be darn sure that

21  you're not standing anything that shouldn't be redacted.  So we

22  just unredacted those.  If there was a question, we pushed it

23  out.

24          We did what we were supposed to.  Amgen took a

25  different tact -- oh, and by the way, the other thing he did,

Argument - Haas / Griffinger                    43

1    we commenced depositions on October 3rd.  Amgen did unredact

2    the documents and since we have the issue that's going to come

3    up before Your Honor now.  And we're going to have other

4    redactions because --

5            In any event, they didn't unredact.  They didn't

6    commence depositions.  They didn't commence depositions in

7    October when we did.  They waited until a couple weeks ago.

8            But the unilateral election not to proceed with

9    discovery is not grounds for adjournment.  They have had more

10   than enough discovery since October 2007 to proceed with this

11   case.  Nothing has changed since.  Everything is going

12   according to the schedule that they proposed.

13           Your Honor, we would strongly urge that there be no

14   adjournment at trial, so that we can get this case tried this

15   year.  That's what the schedule calls for.

16           THE COURT:  Thank you.

17           MR. HAAS:  Thank you, Your Honor.

18           THE COURT:  Mr. Griffinger.

19           MR. GRIFFINGER:  Good morning, again, Your Honor.

20           THE COURT:  Good morning.

21           MR. GRIFFINGER:  I'll address the disaster recovery

22   tape issue first.  And you have letters on that.

23           I do have a handout, if I may approach?

24           THE COURT:  Sure.

25           MR. GRIFFINGER:  It's sort of lays out in a little

1    bit more detail in color.

2              THE COURT:  Thank you.

3              MR. HAAS:  Thank you.

4              MR. GRIFFINGER:  And there's a history on this, and

5    that's why I've taken the time or our team has taken the time

6    to put together this little flow chart for Your Honor, and I

7    think it tells a very compelling story.

8              What is this about?  This is about litigation -- pre-

9    litigation disaster recovery tapes.  In other words, tapes that

10   were prepared at Amgen before this litigation was begun in late

11   October of 2005.

12             At the outset of the case, we set aside as we say

13   there about 14,000 disaster recovery tapes.  Ortho said, well,

14   we want three days of your disaster recovery tapes and we

15   estimated that at approximately 3,000 tapes.  And we told them

16   as we told Your Honor in one of our letters that our estimated

17   cost at that time was about a million dollars.  And we said,

18   but we can help you out on this.  We can make life a little

19   simpler for you because we have what are called catalogue

20   tapes, which I understand are something like a table of

21   contents or an index.  So that would enable you if we restore

22   those for you, which were also disaster recovery tapes, you can

23   take a look at those and decide which tapes you want, so we can

24   really narrow the universe.  And we did that for them and they

25   said, that's good; please do that.  They wanted to save money

1   too.  So we sent them over to Renew Data, and we restored the

2   catalogue tapes at a modest cost as you can see, of under

3   $10,000.  And we gave them to them.  And then they said, okay,

4   thank you, that's helpful.  We want the October 8 tapes.  We

5   said, all right, let's see what that's going to entail.

6         So we looked and we found that there were 855 tapes

7   from October 2005 that contained files belonging to these 21

8   custodians that they wanted.  And relying on that, our

9   analysis, Ortho said, all right, here's what we want.  We want

10  24 of your disaster recovery tapes.  And as we say, it took us

11  about 240 person hours just to get to this stage for which, of

12  course, we're not charging them.

13        So we get the 24 disaster recovery tapes, we send

14  them over to Renew Data to be restored.  Now you'll see a

15  footnote there.  I think it gives you a sense of the scope of

16  this matter.  Footnote says that each disaster recovery tape, I

17  have one here, demonstrative evidence, that each contains 50

18  gigabytes of data.  And based on our estimates, 50 gigabytes

19  represents approximately 1.2 million electronic files.  That's

20  a lot of electronic files.  Those are like e-mails or word

21  processing.

22        And so we restored them.  We restored them again and

23  Renew Data charged $41,000 for that.  A total so far of

24  $50,000.  And by the way, Ortho said, we'll pay for that.  They

25  haven't to the best of my knowledge sent a check yet, but we

1   understand that they have committed to pay for that.

2          Well, that's where we are.  By the time Renew Data

3   finishes restoring the disaster recovery tapes.

4          What's remaining to be done to give Ortho what it has

5   requested, we have to go to Epic.  As you can see on the chart,

6   they have to process the data, run keyword searches.  Once

7   again all designed to try to narrow down the universe of

8   information that's going to ultimately be turned over to them.

9   And keyword searches, privilege filters, try to identify

10  duplicates.

11         And then what we do, we have to turn those documents

12  over to the Amgen attorneys because they have to be reviewed

13  for responsiveness to document requests, for privilege, for

14  confidentiality, and for any necessary redactions.  It's got to

15  be done.  It's been done by them with their document

16  productions, but done by us.  It's an absolute necessary step

17  to accomplish what they want.

18         Have they demonstrated unlike so many of the cases,

19  the federal cases, I note Mr. Haas did not rely on the key New

20  Jersey State Court case that we've cited, the Delta Financial

21  case, but all those cases talk about spoliation.  They talk

22  about missing e-mails.  I'm sure Your Honor's familiar with all

23  this electronic litigation that goes -- electronic ESI

24  litigation that goes on.  It really relates to, are we getting

25  your documents or are we not?  Have you done something?  Have

1   you destroyed them?  Are they missing?  Are they in some

2   fashion unavailable to us?  And if that's the case, yeah.  Then

3   we're not going to -- we, the seeker of the documents, are not

4   going to pay you for something you've done wrong.  But here

5   there has been no suggestion, no showing of anything.  In fact,

6   we've said, we think a lot of these things to be duplicates.

7   Many I'm sure will be.  But they want them, so all we're asking

8   is that they pay for them.

9          And that includes the attorney review, that includes

10  the final step that you see on the chart there, that Epic has

11  to convert these files into TIF images, Bates number them,

12  designate them confidential if the attorneys say that they are,

13  load them up and produce them to Ortho.  It's an expensive

14  process.  We don't know what the costs of Epic are going to be

15  or what the attorney time is going to be.  We've done our best

16  to very, very selectively assist in narrowing the universe of

17  documents that they have requested.  But this is their request,

18  not our wrongdoing.  No showing of anything improper.

19         So for that reason, we want to be reimbursed for the

20  costs that we are incurring for achieving the result that they

21  have requested.  And I think as I said, the Delta Financial

22  case makes it clear.  I think we put that into our

23  correspondence.

24         And one other thought and that is, do we ever waive

25  the concept of attorneys' fees as Mr. Haas suggested, Mr. Walsh

1   in his correspondence said, all -- all we want are certain

2   costs.  The answer's no.  In fact, on April 30th we wrote to

3   Mr. Wang of the Patterson Belknap firm and said, this is going

4   to be a substantial burden on Amgen.  It will require Amgen to

5   pay attorneys to review for responsiveness and privilege

6   hundreds of thousands of pages of documents.  The result of

7   that effort likely will be the production of no new documents,

8   or if any, a very small number of new documents.  That's true

9   then in April of 2007.  It's true today.  They knew there was

10  no waiver.  There is no suggestion that we were in any way not

11  going to incur a cost that we sought reimbursement for for the

12  attorney review.

13          That concludes my discussion of disaster recovery

14  tapes situation, Your Honor.

15          Now let me talk about scheduling.  And I'm going to

16  go on a little bit longer than Mr. Haas, if Your Honor will

17  indulge me because I think there is good reason to give Your

18  Honor a good context on this.

19          When Mr. Timpone and Mr. Haas wrote to Your Honor on

20  December 10th, two days before our conference, they wrote,

21  "Virtually all of Ortho's production was complete by October."

22  And they go on, "with the limited exception being Ortho's

23  responses to Amgen's related incremental and overbroad demands

24  designed solely to contrive grounds for delay" blah, blah,

25  blah.

1           Mr. Haas talked about the perfect storm.  I

2    understand that situation with the one custodian, but the

3    operative language here is telling Your Honor, "Virtually all

4    of Ortho's production was complete by October."

5           Well, let's take a look, if I may hand up what has

6    occurred since October.  This chart is in reverse chronological

7    order from the second page reading up from the bottom, other

8    than the CRA matter, which I'll talk about in a minute, we show

9    what has occurred since October.

10          And just scanning the chart that I've handed up, Your

11   Honor can clearly see what production we have received since

12   October.  Including last Friday, another 136,000 documents, the

13   very first item on the first page.  And some documents we don't

14   even know how many pages there are, but the documents we've

15   gotten from Ortho since October, three-quarters of a million in

16   pages and disks and other format.

17          CRA.  CRA is Charles River Associates.  I don't know

18   if Your Honor is familiar with them.  They are a consulting

19   firm out of Boston.  Ortho relies very heavily on CRA in doing

20   all their contracting and strategizing about how to compete.

21   And, of course, this case is about competition.

22          So we have Charles River Associates documents which

23   in fact in the preliminary injunction phase we saw many, giving

24   them strategy; here's what you should do to counter Amgen;

25   here's our advice.  And they generally follow it.  So CRA is a

1   very important third party here.

2          Patterson Belknap represents them with respect to the

3   subpoena that we served upon CRA because we want their

4   documents.  We know that they are a major motivator and

5   instrumentality in the contracting and competitive activities

6   of Ortho.

7          So when do we subpoena them?  October 12th.  As Your

8   Honor can see from the bottom of the second page, we agree, we

9   said we know this will take some time; we'll give you until

10  December 15th, Patterson Belknap, to work with CRA, to produce

11  the documents responsive to these subpoenas.  We didn't get

12  them on December 15th.  We got them just a couple of weeks ago.

13  And what did we get?  326 million -- 326,000 pages.

14         So without belaboring this, this chart demonstrates

15  that since October when they protested that their document

16  production was complete, we've received over a million pages of

17  documents, and as recently as last week and the week before.

18  That's the production that we've received.

19         We need updated data.  We've had some discussions

20  with Ortho's counsel about updating the database information.

21  Why?  I think you heard a little bit from both Mr. Whitney and

22  Mr. Haas about the dynamics --

23         THE COURT:  Uh-huh.

24         MR. GRIFFINGER:  -- of this marketplace and what's

25  happened.  The cutoff was January, I think January 8th of 2007.

1  I think everybody's told you that.  It's Haas's December 31,

2  it's virtually the same thing.

3          But what has happened since that cutoff date, in

4  March of 2007, the Black Box warning was imposed upon both

5  companies which changed the dynamics of the marketplace.  In

6  July -- on July 30th, 2000, there was something called the

7  National Coverage Decision.  And that's a decision by CMS,

8  that's as everybody's told you, that's the outfit that sort of

9  governs the Medicare reimbursement program.

10         In that decision a limited reimbursement for this

11  class of drugs.  That, again, had a major impact on the

12  marketplace and on sales.

13         In November of 2007, there were label revisions and

14  Ortho came out with a new agreement in November of 2007; and,

15  subsequently, with a 4.8 percent price increase.  And that's

16  just in 2007.  Now what's happened?  What happened in the

17  marketplace?  I'm sorry to say for my client that the demand

18  for these drugs has dropped by 50 percent.  What was a growing

19  market has dropped down to approximately 50 percent of what it

20  was the year before.  That's a huge see change in a competitive

21  marketplace.

22         What has happened even since?  Today as we sit here,

23  and Mr. Haas is well aware of this, Amgen has rolled out a new

24  contract effective today.  Again, a new change in the

25  marketplace.

1          In March, next month, there is going to be a meeting

2    of ODAC.  That's O-D-A-C.  That's the Oncologic Drug Advisory

3    Committee.  That's a committee that advises the FDA about the

4    safety and efficacy of drugs.  They're meeting with respect to

5    these drugs, Procrit, Aranesp, and Epogen.  They're going to

6    take a good look at safety and efficacy which has been in the

7    papers and has been the subject of some discussions that Your

8    Honor may be familiar with.  I think we mentioned it last time

9    when we were in chambers with you.

10         Nobody knows what ODAC will do or recommend to the

11   FDA or what the FDA will adopt following March -- the March

12   meeting and presentations.  As I say, I give you this

13   background because it is such a dynamic and changing and fluid

14   marketplace.

15         All of these things have impacts upon competition.

16   Now why do I give you that background?  Because we want updated

17   databases of information on sales and costs and other material

18   information that will go into the expert's review of whether or

19   not there is an antitrust violation in this marketplace.

20         Experts cannot opine on data that is stale and we

21   have discussed this with counsel.  I think we have a tentative

22   agreement.  I'm not going to put words in their mouth, that

23   we'll update the databases, the critical databases through year

24   end 2007.  We would like it updated through June 30 of this

25   year because the experts are not going to be putting in their

1    reports in our view until after that, and we'll need that

2    current information.  And you will see when I hand up our

3    proposed schedule that that is what we seek.  And that's the

4    crucial, that's the guts of this case, these databases, the

5    costs and the revenue and discount rebate information.

6            So I'm giving you the context of why we do that.  How

7    does that tie into the schedule?  Well, because of the, we

8    politely call it, tardy document production that I've given you

9    on a chart, because of the database updated needed, that's two

10   points.  Let me give you a couple more and I'll try to do this

11   quickly.

12           Last night, last night we received electronically the

13   general ledger of Ortho.  The general ledger has all the key

14   sales cost information.  We are still trying to work out with

15   Ortho a substitute for plunging into the general ledger and its

16   intricate detail.  We haven't looked at it because it came in

17   about seven o'clock last night electronically, and I quit about

18   that hour I think last night.  Well, actually, I didn't.  I

19   didn't look at the general ledger.

20           We also got in last night a privilege log.  We've

21   exchanged privilege logs.  This is an important point if I may

22   make it.  And that is, in the privilege log that we received

23   from Ortho last night, there were 47,976 entries.  Now I know

24   Your Honor really wants to do an in-camera review of that.

25           THE COURT:  Can't wait.

1       MR. GRIFFINGER:  But we -- we are not there; and,

2  hopefully, we'll never be there.  But in that log, there are

3  34,250 documents which were withheld entirely on the basis of

4  privilege, 13,750 documents were redacted on the basis of

5  privilege.  More than 4,000 documents have a blank author field

6  and 21,887 have entirely blank recipient fields.

7       And we just printed out about 20 pages of that log,

8  not a random sample because we printed this out by asking for

9  author unknown and recipient unidentified.  And if I may hand

10 up to Your Honor what we are facing with this privilege log.  I

11 think you will see from this that it's going to be very

12 difficult for us to test this privilege log because we can't

13 take the deposition of the author or the recipient to find out

14 if it's truly confidential.

15      Unlike the argument you just heard about Mr. Hansen's

16 deposition where he was asked about documents, thumbing through

17 this, a couple of names of CCs are mentioned, but other than

18 that, we draw a blank.

19      So this is going to be a problem not for today, but

20 it's going to be a problem and we will meet and confer and see

21 how far we can get.

22      We still have some issues on redactions.  They

23 unredacted 150,000 documents which we have to re-review.  We

24 still have some specially specifically identified document

25 issues that we're trying to work through.  Again, trying to

1   keep all this off -- off your docket.  But nonetheless things

2   that are going on that you should know about.

3          And let me talk about the depositions, because Mr.

4   Haas said, we've -- they've started depositions.  Your Honor,

5   we had an agreement of 25 depositions per side.  As I think

6   Your Honor recalls, we had a little dispute about something and

7   we resolved it.  I don't know whether it was with Your Honor in

8   chambers, or whether we did it in the room next door here, but

9   we agreed.  Okay, one more per side, and unless Your Honor has

10  an objection, we have agreed to 26 and 26.

11         THE COURT:  Uh-huh.

12         MR. GRIFFINGER:  Now they've taken about five.  We

13  haven't taken any because we have noticed several, and they're

14  on the boards very quickly, but we wanted to get the document

15  production complete as we've said to you many times, and we've

16  put out a 30(b)(6) notice.  That 30(b)(6) notice went out on

17  January 9th and they responded and identified people who would

18  be the representatives of Ortho to tell us who would talk about

19  which subjects.

20         We got that response on January 28th, earlier this

21  week, I guess that's Monday of this week.  And they named eight

22  people, and that's, exactly, of course, what we wanted to know

23  who these folks are, so we can get going on it.  And, of

24  course, our next step was, okay, when are they available, these

25  eight people?  I have an e-mail that came in Wednesday saying,

1    three of these people will be available on the following dates:

2    February 14th, March 7, March 13.  That's three of the five,

3    two in March, one or two days before the present deadline for

4    fact discovery.  That's going to make life a little difficult

5    for us to complete discovery by March 15th.

6            So if everybody takes the allowed depositions, we're

7    talking about a remaining number of about 47 depositions, and

8    we have 29 business days between now and the current deadline.

9    And we've done double tracking before, but that is really

10   unreasonable, unfair, and prejudicial to us who have just

11   received documents.  Who still have issues going -- just got a

12   privilege log, just got a general ledger for all these things

13   we think -- we don't have a trial date.  Judge Chesler has not

14   set a trial date, and there's no prejudice to extending the

15   discovery schedule.

16           We're not asking for any change in the trial date or

17   pretrial date which has not yet been set.  That's up to Your

18   Honor and Judge Chesler.  What we're asking for is an extension

19   of discovery, so that we can get the information rationally, so

20   that we can get updated information to our experts, so that the

21   reports are going to be meaningful in the environment, the

22   dynamic and changing environment that we are in.

23           And for that reason I'd like to hand up to Your Honor

24   a proposed schedule that we sent to Mr. Haas.  There's one

25   change that I'd like to call to Your Honor's attention.  We

1    said update the data through March 30 in the one we sent to Mr.

2    Haas, but we -- we'd like to update the data through June 30

3    for the reasons I've said.  So I'll give you Version 2 which is

4    virtually the same, except for the first entry asking for --

5    not that.

6             All we're asking for, Your Honor, here, and I don't

7    think it's irrational at all, and I know there's always a

8    temptation when we ask for something, and they resist, to be

9    solemnonic about and try to say, okay, I'll go somewhere in

10   between.  I hope Your Honor respects the fact that all we're

11   asking for is a two-and-a-half-month extension on fact

12   discovery and dates that flow from that.

13            And here's my problem.  Your Honor has said that you

14   were going to reconvene with us on February 29th if necessary.

15   That gets very close to the existing March 15th fact discovery

16   deadline.  So I can't ask Your Honor to rule, but I would like

17   some indication from Your Honor that we are not going to have

18   to notice 49 -- 47 depositions between now and March 15th.  And

19   I hope that we can at least get some indication of that today.

20            Thank you.

21            MR. HAAS:  If I may briefly?

22            THE COURT:  Mr. Haas.

23            MR. HAAS:  Briefly?

24            THE COURT:  Very, very briefly.

25            MR. HAAS:  Okay.

Argument - Haas

1          THE COURT:  I'm pretty clear on these issues here.

2          MR. HAAS:  Your Honor, first of all with respect to

3    the chart, we can create one of these for every single document

4    and representations stated, because I'm sure you're aware of

5    the litigation experience.

6          The top half is the conversion.

7          THE COURT:  Uh-huh.

8          MR. HAAS:  The bottom half is what pertains to every

9    single document in this case.  Every single one.  They want us

10   to pay for what every other document -- they want a special

11   exemption for their backup tape files that is different from

12   every other single document case.  That's contrary to the law

13   of contract defining agreement.  The case wasn't in New Jersey

14   case, it was New York State Supreme Court case.  That case

15   there was -- there was not an issue with respect to cost

16   shifting because of the --

17         THE COURT:  The Delta case.

18         MR. HAAS:  Yes, the Delta Financial case.

19         THE COURT:  Yeah.

20         MR. HAAS:  The party agreed up front to pay.  The key

21   to that case was whether they were entitled to discovery at all

22   from backup tapes.

23         So this issue wasn't even on the table.  That case is

24   inapposite.  It doesn't apply.  It doesn't govern.

25         Respect to duplicates by the way, there will be

Argument - Haas

nothing duplicative about this.  The vendor as you should be aware, screens duplicative e-mails and files.  All we're getting is what's new.  That's the only thing that we're -- there's going to be a review of only what's new.

With respect to the production and whether we we've been dilatory.  Your Honor, we have been doing exactly what we said we would do.  We -- the 400,000 pages were from Mr. Haney (phonetic).  That's the one custodian that was delayed.  We explained why there was.  They still had 30 dep -- 30 custodians they could have proceeded with.

The other documents were already produced.  We unredacted them.  So we're just taking the redactions away.  That was less than one percent.  Less than one percent of the total pages.  You can't start your 30(b)(6) witnesses in October when we did because of less than one percent?  That's not a valid point whatsoever.

And, indeed, when you get to that 30(b)(6) notice, which if you take a look at it, Your Honor, I gave it to Your Honor, it's extraordinarily broad.  Why not serve that when we did back in October?  Then you wouldn't be running into these self-created deadlines.  This is all stuff imposed.  We have done everything every step of the way.

The general ledger, it wasn't produced yesterday for the first time.  It was produced months ago, after we in May of last year had to go into court to get an order to exchange date

Argument - Haas

1   of time of that.  In the fall, Magistrate Falk said, Amgen,

2   extend your general ledger data.  They took another month to do

3   it.  We exchanged general ledger databases way back in the

4   fall.

5         We in fact produced it in the manner in which it was

6   maintained.  Amgen came back and said, no, no, no, no, we want

7   it in a different manner.  We said, we don't have it in that

8   manner, but we can retain people to actually program that.  But

9   Amgen, you could do the same thing.  They said, no, no, no.  We

10  want you to do it.  So at our cost, we went out and we created

11  a new database which we produced to them.  So we've done it

12  twice.  It's not been a delay on our part.

13        You see, this is the quandary we're in, Your Honor.

14  We are opening our doors, we are doing everything to give

15  discovery, and every time we give additional stuff and they

16  don't, we get penalized because they say, well, look, we just

17  came in.  It came in because we are opening our doors.  We are

18  doing what everybody says we should.

19        We go to the Court, the Court says, unredact.  We

20  unredact.  We give it.  And now they say, oh, we need a delay

21  because it's less than one percent of the documents?  It's time

22  to get this case to trial.  The delay that they're asking for

23  here is not two and a half months, it's another five months.

24  We're pushing off the dispositive motion period to the

25  beginning of 2009.  That means we're not having a trial until

1    at least mid 2009.

2           Your Honor, you know what the real issue is here?

3    The issue has nothing to do with discovery and discovery

4    schedules.  McDermott, Will & Emery is trying a case out in the

5    Ninth Circuit.  That case is the Cascade Financial case.  It

6    uses -- it has adopted a different standard than the Third

7    Circuit.  Amgen doesn't like the LaCage (phonetic) case and

8    this standard.  They don't like this Court's rule of law.

9    They're hoping that case gets brought up.  It's now undone

10   before the Ninth Circuit.

11          They want to try to move that case, get it to the

12   Supreme Court, hoping to change the law of this circuit.

13   That's what this delay is all about.  That's what we're dealing

14   with here.  This case should not be driven by their hopes and

15   expectations and now in the Ninth Circuit.

16          Thank you, Your Honor.

17          MR. GRIFFINGER:  Your Honor, I must object to that

18   last part.  I hope Your Honor will disregard it.

19          Thank you, Your Honor.

20          As far as the general ledger that was produced

21   earlier, here's a copy of it.

22          THE COURT:  Thank you.

23          MR. GRIFFINGER:  I rest -- I rest my case.

24          MR. HAAS:  You saw this last time, Your Honor.  I

25   could print out a copy of every single page of the general

1   ledger that Amgen produced that looks just as jumbled.  This is

2   data.  It's TIF data produced with codes.  We run it into a

3   database and you can use it.  It's exactly what came out of our

4   regular course of business production.

5           MR. GRIFFINGER:  Thank you, Your Honor.

6           THE COURT:  Thank you, Counsel.

7           At this time, while I understand Mr. Griffinger was

8   interested in getting some kind of indication from the Court as

9   to the scheduling piece, I'm not prepared to do that at this

10  particular moment.

11          I did want to hear from both sides as to what the

12  salient points were before making that decision.  I'm going to

13  ask both sides if you have not done so already, and you may

14  have to submit proposed forms of order with regard to the

15  arguments presented here today,

16          I do still plan on proceeding as I set forth at the

17  outset, and that is to allow you to address the one issue.  I

18  really don't think that we're going to have to have oral

19  argument on that; however, I at least wanted both sides to

20  fairly address the issue, so that we could have everything

21  encompassed in one or in one ruling.

22          What I may do with regard to the scheduling component

23  is, extract that one issue and address that as early as

24  possible prior to resolving the other matters, okay?

25          MR. GRIFFINGER:  That would be very helpful.

Court Decision                                    63

1         THE COURT:  Let me also say this, Counsel, I really

2    appreciate the quality and the caliber of representation here

3    today, but please no one submit anything further on the issues

4    that were argued here today.  I don't want any other

5    submissions between now and the time that I rule on this

6    matter.  Okay?

7         MR. GRIFFINGER:  Just --

8         THE COURT:  Thank you, Counsel.

9         MR. HAAS:  Thank you, Your Honor.

10        THE COURT:  Have a great day.

11        MR. WHITNEY:  Your Honor, would you like a separate

12   proposed forms of order on the schedule versus the two other

13   issues that are before you?

14        THE COURT:  That would be very helpful.  Thank you

15   very much.  I would like that.

16        Thank you.

17        MR. WHITNEY:  Okay.  Thank you, Your Honor.

18        MR. GRIFFINGER:  Thank you, Your Honor.

19            (Proceedings concluded at 12:15 p.m.)

20        I, certify that the foregoing is a correct transcript

21   from  the  electronic  sound  recording  of  the  proceedings  on

22   February 1, 2008, 10:45 a.m. to 12:15 p.m. in the above-entitled

23   matter.

24   02/19/08                          s/ Lisa Mullen
     Date                              Lisa A. Mullen
25                                     KLJ Transcription Service